8 So.2d 271
### WILLIAMS v. STATE.
I Div. 406.

Court of Appeals of Alabama.
April 7, 1942.

Rehearing Denied May 12, 1942.

Thos. S. Lawson, Atty, Gen., and Francis M. Kohn, Asst. Atty. Gen., for the State.

Bart B. Chamberlain, Jr., of Mobile, for appellant.

BRICKEN, Presiding Judge.

Upon an indictment which charged this appellant, defendant below, with the offense of murder in the first degree, he was convicted of the offense of manslaughter in the first degree, and his punishment was fixed at imprisonment in the penitentiary for a period of two years and six months.

On the trial of this case, in the court below, the defendant admitted that upon the occasion in question he shot deceased with a pistol, and the evidence, without dispute, disclosed that Lovell Turner, the deceased named in the indictment, died as a result of said shooting. There was but slight, if any, conflict in the evidence in this case, and it is strenuously insisted by appellant, that the testimony showing the killing also disclosed the undisputed fact that the shooting of deceased by the appellant was in self-defense, and in order to save his own life. In this connection it is urgently contended there was no evidence tending to show, that the defendant said or did anything to provoke, or bring on, the difficulty, and further, that said evidence tended to show throughout that the deceased started the difficulty and was the aggressor from start to finish.

■ From a careful reading and an attentive consideration of all the evidence in this case, the foregoing insistence appears to be substantially borne out and sustained. This court, however, is without authority to put the court in error for the refusal of the general affirmative charge, for the reason the bill of exceptions fails to state that the evidence contained therein was all, or substantially all of the evidence adduced upon the trial of this case. To the contrary it affirmatively appears that certain purported documents were admitted in evidence upon motion of Solicitor in connection with the testimony of certain State witnesses and these documents were made State exhibits "F" and "G" and so lettered and endorsed. Said documents nowhere appear in the bill of exceptions, hence the necessity of the above ruling.

As to the facts incident to the difficulty in question, it appears from the record that this appellant Hillary Williams was employed as a waiter in the place, or resort, where the homicide occurred. The name of the place was the "Red Rooster" and a very large number of colored people were present when the difficulty started, which was about 12:00 or 12:30 at night. Williams was taking orders and waiting on the patrons, serving food, drinks, etc. The most intelligent version of what occurred upon the occasion is disclosed by the testimony of witness Higgins who testified, among other things, substantially as follows: "I was there when the trouble started this night. It started in the back part of the place I was there in the back when it started. This man that was killed, Lovell Turner, was sitting in there at a table. There were two women there with him. After the commotion started, his brother came back there from the front. They were drinking something there at that table, that is, it was on the table. When I first noticed the commotion, they were drinking beer or whiskey. Then the light-skinned Turner (deceased) struck the light-skinned woman twice with his hand or fist. He struck her here and knocked her back to the wall. He struck her with his right hand. His fist or his hand. It was a flashing lick that you could hear all over the place. The dark-skinned woman ran between them. He backed off and opened his knife. He had this knife open and up his sleeve. It was a red knife with white stripes on it. I then went to the front and told Edwards that a man had an open knife back there and that he had struck a woman and he was using bad language. Edwards came back there and told him to close his knife and to leave the place. Then the dark-skinned Turner said, 'You can't do anything with him. I will take him out.' That was when Hillary Williams (defendant) came up and said, 'You will have to leave.' Then the light-skinned Turner got fierce and began to curse and said that they had been spending their money in there and that they could stay if they wanted to; that, 'If you ain't satisfied how quick I get him out, then you can have what we got.' Then the two of them backed Hillary Williams out to the front. When these two men backed Hillary Williams out they turned the table over on the woman. There were about 100 people in there and 30 or 40 of them were in the back. I went to pick the table up. Hillary Williams came over there with the Turner boy behind him. Turner cut him a couple of times with his knife. Then he, Williams, ran into the stove and knocked the red hot stove over. I noticed the defendant come over behind the stove and then saw him running toward the front for all he was worth, with Turner behind him. Then they went out through the door and

all of them started trying to get out of the room into the front. There was lots of shoving and I found myself on the sidewalk and didn't know how I got there. I was not drunk. It seems like this crowd of about 200 people just carried me out there. All of the whole crowd came out into the front; they pushed out into the front, and I just came out in the rush. Then they said that the other boy had been shot and this boy had been cut. I am an employee of Conk Thompson's Red Rooster. Conk Thompson and Henry Edwards run the Red Rooster."

"Court: Did the place catch on fire? A. Yes."

Of like import was the testimony given by the defendant. He testified, among other things, substantially, as follows:

"I am Hillary Williams, the defendant in this case. The night that Lovell Turner was shot out at the Red Rooster I was working out there. This is the jacket I had on that night. It is in the same condition that it was that night. When I went to work out there that night this jacket did not have holes in it and it had not been cut. I had just bought it. It did not have any red stains on it. I was working there on Fridays and Saturdays. This boy Turner was there in the back with some ladies. I served them four bottles of beer. After I served it I come out to the front. About fifteen or twenty minutes later, Henry Edwards come out there and said there was a man fighting a woman in the back. I went back there and said if they couldn't stop making all that noise, they had better go on out. When Henry called me, he said there was a man back there beating a woman up. When I got back there, there was a lot of noise and fighting going on. These two brothers were sitting there at the table with two women. One of them jumped up, and he had a long switch blade knife. The other one had a knife too. He said, 'Hillary, we spend our money in here and we going to stay.' Then he made a break at me. I run away from him, and then through the door with him after me. He had cut me and then I shot. I kept on running. After I shot the first time I ran over near the stove. He was behind me with a knife and I slipped down. Someone said the woman shoved him on top of me to keep him from cutting me worse. I run into the stove and knocked it down. While I was back there by the stove I don't know if I shot again or not. I was

running with the pistol, and I circled and came through the front, running. There was a big crowd standing near the door trying to get out. I just kept on running. He cut me here and here. I don't know whether he cut me once while I was in the door or not. I did not have any scars on my face and in the back of the neck before I went there to work that night."

Following the above the record shows the following:

"Note: The witness then stooped down and put his finger on the scars where he was cut that night.

"The witness then continued to testify as follows:

"I got cut on the back of my neck. That is where Lovell Turner cut me. Lovell Turner put these cuts in this jacket here. Those red marks there is my blood that ran on to the jacket from the cuts that Lovell Turner gave me. It is in the same condition as it was just after the fight.

"Mr. Chamberlain, Jr.: I offer in evidence this green jacket here.

"Mr. Chamberlain, Sr.: I object to the introduction of that jacket at this time, the State not having had the opportunity for cross examination with reference to it.

"Court: Sustain the objection.

"Mr. Chamberlain, Jr.: I except."

The record also shows the following:

"Mr. Chamberlain, Sr.: I wish to offer in evidence this bullet that Dr. Grubbs testified he got from the City Detectives and Mr. McConnell, the City Detective, testified was taken from the body of Lovell Turner as State's Exhibit D, and also these clothes identified by Officer McConnell as the clothes of the man who was killed, which he was wearing at the time he was killed, as State's Exhibit E."

One of the principal insistences of error, in order to effect a reversal is expressed in brief of counsel for defendant as follows:

"During the trial of this cause, and, more particularly, while the defendant was on the witness stand testifying in his own behalf, counsel for appellant (defendant) showed to the defendant a green corduroy jacket, and asked him to identify it as the jacket which he was wearing at the time of the killing. This the defendant promptly did and further testified that the jacket was in the same condition (then, when shown to him while on the witness stand),

as it had been immediately after the fight which he had with the deceased at the time when the deceased was killed. The defendant then offered said jacket in evidence and the State objected to its introduction solely on the ground that the State had not the opportunity to cross-examine the witness then testifying, as to the jacket. As a matter of fact, it will appear from a thorough reading of the final record in this cause, that the state did not, when the opportunity presented itself, even touch upon the subject of the jacket during its cross-examination of the defendant, and only agreed for the same to be offered in evidence after the case had been offered to the jury and after the Court had charged the jury fully as to the law, that is, after the jury had retired to the jury room. Then the State offered to allow the jacket to be introduced into evidence; after the defendant's counsel had been deprived of his opportunity to argue this important piece of evidence and the inferences that could be drawn therefrom.

■ The foregoing insistence is well taken and is sustained. The court erred in sustaining the State's objection to the admission in evidence of the corduroy coat which the evidence conclusively shows the defendant was wearing at the time he received from deceased the grievous knife wounds disclosed by all the testimony, and the scars of which upon the person of defendant, were exhibited to the jury. The proper predicate, full and complete, was proven before the coat or corduroy jacket was offered.

It cannot be questioned, that the coat as described, with the rent or cut places, and blood of the defendant thereon, were physical facts tending to establish highly material circumstances in the case, and were also directly corroborative of the testimony of the accused. It has been consistently and repeatedly held where this is true, "articles of wearing apparel are admissible in evidence when they are so connected with the commission of the offense charged, as tend to throw light upon a material inquiry in the case."

The record shows that the ruling of the court under discussion remained throughout the whole trial of the case, and that said ruling was never changed or withdrawn by the court. It is evident that the experienced and able Solicitor realized finally that said ruling invoked by him was in error, and as a consequence, after the trial

of the case was concluded, he made the following remark, as shown by the record:

"Mr. Chamberlain, Sr.: I wish the record to show here that the State withdraws its objection to the coat of defendant being put in evidence."

■ The above remark of the Solicitor could have in no manner changed the ruling of the court, which as stated said ruling remained throughout the entire trial, and was never, as stated, changed or withdrawn by the court.

Another exception insisted upon, relates to a certain statement of the Solicitor in argument to the jury, wherein he stated: "Dr. Grubbs stated that this man fired the bullet that severed the spinal cord." Whereupon Mr. Chamberlain, Jr., objected to this statement in argument on the ground that there was no such statement in evidence, and asked that the court stenographer be required to read her notes with reference thereto. The court overruled the objection. Mr. Chamberlain, Jr., excepted to the court's ruling. As to the foregoing, by adverting to the testimony of witness Dr. Grubbs, on page 8 of record we find that said witness stated: "In wound No. 1 the bullet went in below the nipple, and lodged in the ligament just beyond the backbone, but did not sever the spinal cord."

Another exception, as shown by the record is as follows: "During argument of Mr. Chamberlain, Sr., Attorney for the State, Mr. Chamberlain, Sr., made the following statement: 'Vernon Higgins, a witness here today for defendant, if given a coat of black hair, nothing would look more like a black bear than he would.' Mr. Chamberlain, Jr., objected to the argument as improper and moved the court to exclude the statement from the jury. The court sustained the objection and granted the motion."

It will be noted the court ruled with defendant, sustained the objection and granted the motion to exclude the remark. Appellant, however, insists that the court should have gone further in order to eradicate the wrongful and unfavorable impression upon the jury as to said witness. Whatever merit there may be in this insistence we deem it unnecessary to discuss in detail as not being necessary to the conclusion in this case.

■■ We are of the opinion, however, that this appellant, defendant below, was not

accorded the fair and impartial trial contemplated by the fundamental law. The law in its wisdom provides that every person charged with crime is presumed to be innocent, and this presumption is not an empty or meaningless provision; to the contrary, it is regarded as evidence in behalf of the accused, and attends him as such throughout the trial, or until the presumption is overcome by legal evidence which shows his guilt beyond all reasonable doubt and to a moral certainty. Conjectures, suspicions, hatred, prejudices, conclusions, and guesswork have no place in the proper administration of the law. 6 Alabama Digest, Criminal Law, ☞ 308.

Reversed and remanded.